UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMRA DIXON, o/b/o
G.D., a minor child,

        Plaintiff,                    Civil Action No. 10-cv-14283

      v.                         District Judge Marianne O. Battani
                                  Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 15, 19]**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Tamra Dixon, proceeding *pro se*, brings this social-security action on behalf of her minor child, G.D.  Plaintiff challenges the final decision of Defendant Commissioner of Social Security ("Commissioner") who denied her Supplemental Security Income ("SSI") application filed on behalf of G.D.  Both parties filed summary judgment motions (and related papers) (Dkts. 14, 15, 19, 20, 21), which are before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 3, 16).

**I.  RECOMMENDATION**

For the reasons set forth below, this Court finds that a remand for consideration of evidence Plaintiff has produced to this Court after the ALJ issued her opinion and that is not part of the administrative record is not warranted.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the

Commissioner be AFFIRMED.

## II.  REPORT

### A.  Procedural History

Plaintiff, G.D.'s mother, applied for supplemental security income on behalf of G.D. on September 7, 2006 asserting that G.D.'s disability onset date is September 1, 2001.  (Tr. 27, 134.) The Commissioner initially denied Plaintiff's application on December 19, 2006.  (Tr. 27.)  Plaintiff then filed a request for a hearing, and on August 21, 2009, she appeared without counsel before Administrative Law Judge ("ALJ") Priscilla M. Rae, who considered the case *de novo*.  (Tr. 39.) In a December 17, 2009 decision, the ALJ found that G.D. was not disabled.  (Tr. 27-39.)  The ALJ's decision became the final decision of the Commissioner on August 20, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on October 25, 2010.  (Dkt. 1.)

### B.  Background

G.D.'s disability claim centers on alleged mental impairments.  G.D. was five years old on the alleged disability onset date, ten years old at the time Plaintiff applied for SSI, and thirteen years old at the date of the hearing before the ALJ.  (Tr. 8, 27, 134.)

#### 1.  *The Hearing Before the ALJ*

G.D.'s mother (Plaintiff here) testified about G.D.'s school performance.  She stated that in seventh grade, G.D. would not stay in the classroom and "she [would not] stop talking and interrupting."  (Tr. 9.)  Plaintiff testified that G.D. had initially failed seventh grade but, because she completed summer school courses, she would be starting eighth grade in the fall.  (Tr. 10.)  G.D.'s mother also stated that Plaintiff had received repeated suspensions for "talking too much, being in

the halls, arguing or fighting or – [really just about] everything there was to be kicked out for."
(Tr. 11.)  When the ALJ inquired into the number of suspensions, Plaintiff stated "a whole screen"
(apparently referring to a computer screen which listed G.D.'s suspensions).  (Tr. 11; *cf.* Dkt. 14 at
ECF 5-8 (computer printout of G.D.'s 2009 suspensions).)  Plaintiff testified that a physician
recently prescribed G.D. Risperdal and that G.D. would begin to take the medication in the fall.  (Tr.
11-12, 15.)

Ms. Moore, perhaps a relative or family friend of G.D., also testified at the hearing.  (Tr. 18-
21.)  Moore read from a prepared "list" of G.D.'s behavioral issues.  (Tr. 19.)  The list provided that
G.D. could not hold conversations, had a bad attitude, "walk[s] alone and stomps and screams or she
pulls her hair," and hits other people for no reason.  (Tr. 19-21.)  Moore also said that G.D.'s "mood
swings bad. [She] cr[ies] if she can't get her way."  (Tr. 20.)

### 2.  *Non-Medical Evidence*

G.D.'s third-grade teacher, Teresa Barnett, completed a Teacher Questionnaire in connection
with Plaintiff's disability application.  (Tr. 126-33.)[1]  She indicated that she had known G.D. for
one year, and that G.D.'s reading and math levels were "on grade level" while her writing was
"slightly below" grade level.  (Tr. 126.)  Barnett found that G.D. had no problems in the domains
of acquiring and using information and moving about and manipulating objects.  (Tr. 127, 130.)  In
the domain of attending and completing tasks, Barnett indicated "no" or "slight" problems in all the

---

[1]A Teacher Questionnaire asks a teacher to rate a claimant in a number of aspects, or
subcategories, of five functional domains: (1) acquiring and using information, (2) attending and
completing tasks, (3) interacting and relating with others, (4) moving about and manipulating
objects, and (5) self-care.  The questionnaire also asks the teacher to answer questions regarding a
sixth domain: health and well-being.  The questionnaire's scale escalates as follows: "no problem,"
"a slight problem," "an obvious problem," "a serious problem," and "a very serious problem."

subcategories save completing assignments; there, Barnett indicated that G.D. had a "serious problem." (Tr. 128.)  Barnett explained, "[G.D.] can do her homework (knows how), but she rarely brings it back to school." (Tr. 128.)  In the domain of interacting and relating with others, Barnett similarly indicated "no" or "slight" problems except that G.D. had an "obvious" problem in "expressing anger appropriately." (Tr. 129.)  She remarked, "[G.D.] sometimes gets upset when things aren't going her way.  I can talk to her when there is a problem and she listens and comprehends what I'm saying." (Tr. 129.)  In the domain of self-care, Barnett indicated "no" or "slight" problems except for the subcategory of handling frustration where she indicated an "obvious" problem. (Tr. 131.)  Barnett additionally commented that G.D.'s "skills have improved academically.  She has also shown improvement in handling problems and things that may frustrate her." (Tr. 133.)

On November 9, 2006, Darlene Williams, apparently one of G.D.'s fifth-grade teachers but not her primary one, also completed a Teacher Questionnaire. (Tr. 115-24.)  Williams indicated that she had only known G.D. for a month at the time she completed the questionnaire. (Tr. 124.)  With one exception for a "slight" problem, she indicated that Plaintiff had "no" problems in every aspect of all six functional domains. (Tr. 117-23.)  She commented that G.D. worked well in activities pertaining to the acquiring and using information domain. (Tr. 118.)  She did note, however, that G.D. was "sometimes a little emotional." (Tr. 123.)

In March 2009, Plaintiff, G.D.'s teacher, a school administrator, a counselor, and a psychologist all agreed upon a "Behavior Plan" for G.D. (Tr. 165.)  The plan, however, does not discuss the nature of G.D.'s problems but only indicates preventative strategies, (positive) reinforcement strategies, and "procedures to follow when behavior occurs." (Tr. 165.)

4

### 3. Medical Evidence

On September 20, 2004, when G.D. was eight years old, she underwent a psychological evaluation at the Genesee Forensic Center.  (Tr. 192-97.)  (Because the last two pages of the evaluation are not in the administrative record, it is unclear what type of medical professional administered the test.)  The evaluation included "Beck Youth Inventories" testing which "measure[s] the presence and degree of several psychological factors in children and adolescents."  (Tr. 192.) The constructs measured are "Self-Concept, Depression, Anxiety, Anger, and Disruptive Behavior." (Tr. 192.)   The evaluator concluded that G.D.'s Beck Youth Inventories results were not "elevat[ed]."  (Tr. 193.)  The evaluator noted that G.D. had "no serious negative behavioral reports from [her] school during [her] entire matriculation."  (Tr. 194.)  The evaluator also remarked that "[t]here have been no incidents of disrespect towards authority figures, such as teachers."  (Tr. 195.)

In late November or early-December 2006, when G.D. was 10 years old, Dr. S. Sood and Dr. Syd Joseph, a psychiatrist, completed a Childhood Disability Form on behalf of the State Disability Determination Services ("DDS").  (Tr. 167-72.)  The state-agency physicians reviewed G.D.'s records (but apparently did not personally evaluate G.D.) and found that G.D.'s impairments of "adjustment disorder with depressed mood" and asthma were not severe impairments.  (Tr. 167.) Regarding the six functional domains relevant to child-disability cases, the doctors found that G.D. had "no limitation" in the domains of attending and completing tasks, moving about and manipulating objects, and self-care.  (Tr. 169-70.)  Further, G.D. had "less than marked" limitations in the domains of acquiring and using information, interacting and relating with others, and health and physical well-being (the last because of her asthma).  (Tr. 169-70.)

On December 6, 2006, Karen Marshall, LLP and Marianne Goergen, Psy.D. completed a

Psychiatric/Psychological Medical Report for the State DDS. (Tr. 199-202.) Plaintiff and G.D., then ten years old, were present at the evaluation, and the evaluator remarked that G.D.'s "mother had pressured speech, flight of ideas, which made the information that she provided confusing and vague at times. . . . [The mother's] responses were irrelevant, thus making obtaining an accurate history difficult." (Tr. 199.) Nonetheless, G.D.'s mother reported that "mood swings" interfered with G.D.'s work. (Tr. 199.) G.D. reported that "when I get mad, I don't do my work." (Tr. 199.) Although only a few months into the school year, the evaluators remarked that G.D. "had no detentions or suspensions this year." (Tr. 200.) Regarding G.D.'s social relations and interactions, G.D. reported that she "get[s] mad because [her mother] asks so many questions over and over." (Tr. 200.) The evaluators concurred: "it was noted that [G.D.] would become irritated and frustrated with the mother's question throughout the evaluation." (Tr. 200.) When the evaluators asked G.D. about her mood, she cried. (Tr. 200.) Marshall and Dr. Goergen concluded that G.D. "appears to have a history of frustration and behavioral problems in school, although this year they are only occulating one time per week and may be related to an undiagnosed learning disability. She also experiences irritability, frequently . . . over the last year[,] which appears to be related to the mother's confusing and disorganized parenting style." (Tr. 201.) G.D. was diagnosed with "adjustment disorder with depressed mood, chronic" and assigned a Global Assessment Functioning score of 58. (Tr. 202.)[2]

---

[2]"GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. . . . A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Revision 2000)). A score of 51 to 60 reflects the assessor's opinion that the subject has moderate symptoms or

On February 17, 2009, G.D., then 12 years old, went to her family doctor, Mohammed Syed, M.D. (Tr. 207-08.) G.D.'s mother reported that G.D. "has been disruptive at home and in school. The child's teachers have expressed concern regarding [the] patient's ability to concentrate and follow through with school work and activities." (Tr. 207.) Dr. Syed noted, "Mom would like patient tested for ADHD." (Tr. 207.) Dr. Syed referred G.D. for evaluation by Dr. Ramesh Chheda, M.D.

On April 13, 2009, Dr. Chheda examined G.D. for "frequent tantrums and mood swings slowly increasing in frequency over time." (Tr. 218.) G.D.'s mother reported that G.D. "is inattentive and gets distracted easily. [She] [o]ften argues with teachers, parents and other adults. [She] actively or passively defies authority such as teachers, parent[s], etc." (Tr. 218.) Dr. Chheda also noted that G.D.'s history included severe rage episodes, throwing things, and hating herself. (Tr. 218.) G.D.'s mother feared G.D. may try to hurt her siblings or adults. (Tr. 218.) Dr. Chheda concluded:

> Patient exhibits many characteristics of ADHD. However[,] ADHD can mimic or coexists with many other conditions such as learning disability, ODD, conduct disorder, anxiety disorder, PTSD, depression, and BPAD, etc.
>
> Medical conditions can mimic ADHD such as absence epilepsy, sleep disorders, neurodegenerative disorders, developmental delay, Asperger's disorder.

(Tr. 219.) Dr. Chheda also noted that G.D.'s mother wanted to try "pharmacological intervention." (Tr. 219.)

---

moderate impairment of social or occupational functioning. *Id.* at 511.

7

### C.  Framework for Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).  The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.*  Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing.  *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment.  *See* 20 C.F.R. § 416.926a.  "Medical equivalency is covered by 20 C.F.R. § 416.926; functional equivalency is covered by Section 416.926a." *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

8

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio 2009) (citing 20 C.F.R. § 416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20 C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926.

Regarding functional equivalence, there are six "domains" that an ALJ must consider: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations in two of the six. *See* 20 C.F.R. § 416.926a(d). A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the functioning expected to

9

be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that G.D. has not engaged in substantial gainful activity since September 7, 2006 – the SSI application date. (Tr. 30.)[3] At step two, the ALJ found that G.D. had the following severe impairments: asthma and adjustment disorder. (Tr. 30.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 30.) The ALJ provided that she considered Listings 103.03 (Asthma) and 112.04 (mood disorders). (Tr. 30.)[4]

The ALJ also found that G.D.'s impairments did not functionally equal a Listing. (Tr. 30-39.) In particular, she found that G.D. had "no" limitations in five of the six domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving

––––––––––––––––––––

[3]Although G.D.'s alleged disability onset date was much earlier (September 1, 2001), "SSI benefits are not awarded retroactively for months prior to the application." *Wells v. Comm'r of Soc. Sec.*, No. 1:07-cv-666, 2008 WL 2783254, at *8 (W.D. Mich.) *report and recommendation adopted by* 2008 WL 2783254 (W.D. Mich. July 17, 2008) (citing 20 C.F.R. § 416.335 and cases).

[4]The ALJ did not consider the Listing for ADHD. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.11. This was apparently because Dr. Chheda only stated that G.D. "exhibits many characteristics of ADHD" (Tr. 219), but, in the ALJ's view, "did not confirm a diagnosis of the same because these symptoms could also be related to [in Dr. Chheda's words] 'many other conditions . . . .'" (Tr. 32).

about and manipulating objects, and self-care.  (Tr. 30-38.)  In the sixth domain, health and physical well-being, the ALJ found that because of G.D.'s asthma, G.D. had "less than marked" limitations. (Tr. 39.)

Accordingly, the ALJ concluded that G.D. has not been disabled within the meaning of the Act since September 7, 2006.  (Tr. 39.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is

11

limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

It appears that Plaintiff challenges two of the ALJ's factual determinations with evidence that is not part of the administrative record. For one, the ALJ concluded that G.D.'s behavioral problems were in large part attributable to Plaintiff's parenting. Plaintiff contests this conclusion with a letter indicating that Plaintiff is a good parent to G.D. For another, the ALJ relied in part on the Teacher Questionnaire completed by Ms. Williams (indicating that G.D. had little or no problems in the six functional domains) in concluding that G.D. did not functionally equal a Listing. Plaintiff argues that another fifth-grade teacher, a Ms. Lewis, was more knowledgeable than Ms. Williams about G.D. and that Lewis should have completed the questionnaire. Plaintiff has provided the Court a letter signed by Lewis indicating that G.D.'s mood swings interfered with her school work.

In addition, Plaintiff asks this Court to consider other evidence that is not part of the

administrative record such as student behavioral reports from 2009 and post-2009 medical records.

Given the foregoing, this Court construes Plaintiff's arguments as seeking a remand pursuant to sentence six of 42 U.S.C. § 405(g). That sentence provides: "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). As its text indicates, a sentence six remand is only appropriate where a plaintiff can demonstrate that evidence not before the ALJ is "new" and "material," and that there was "good cause" for not producing the evidence earlier. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Evidence is "new" only if it was "'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Further, "new" evidence must not be merely cumulative of evidence already part of the record. *Wilson v. Comm'r of Soc. Sec.*, No. 10-13828, 2011 WL 2607098, at *6 (E.D. Mich. July 1, 2011); *see also Carroll v. Califano*, 619 F.2d 1157, 1161 (6th Cir. 1980) ("[W]here the issue in question has already been fully considered, further evidence on that point is merely cumulative").

New evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) ("Material evidence is evidence that would likely change the Commissioner's decision." (citing *Sizemore*, 865 F.2d at 711)). A corollary to this

requirement is that "material" evidence must be "probative of the claimant's condition for the time period for which benefits were denied." *Wilson*, 2011 WL 2607098, at *6; *see also Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is . . . immaterial.").

A claimant shows "good cause" by providing a reasonable justification for failing to acquire and present the new and material evidence to the ALJ. *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam). Good cause "contemplates more than strategic delay, or sandbagging, of evidence and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability." *Haney v. Astrue*, No. 5:07CV188, 2009 WL 700057, at *6 (W.D. Ky. Mar. 13, 2009) (internal citations omitted).

As an initial matter, the Court notes that several documents attached to Plaintiff's pleadings are not "material" because they pertain to G.D.'s behavior or impairments after the ALJ's December 2009 decision. (Dkt. 14 at ECF 10-12 (notes from math expulsion teacher about G.D.'s 2010-11 behavior); Dkt. 20 at ECF 2-8, 12 (medical records from 2010 and 2011 and a "Behavior Incident Listing" for 2010 to 2011).) In addition, one of the medical records Plaintiff has produced from Dr. Chheda is not "new" because it was already part of the record before the ALJ. (Dkt. 20 at ECF 9-11.) The remaining documents Plaintiff has provided to the Court relate to the period of disability that the ALJ considered and were not made available to the ALJ. These documents therefore warrant further discussion.

14

### 1. *The Boyd Letter*

Plaintiff has produced a letter, apparently written by a "Ms. Boyd," a ten-year volunteer at G.D.'s elementary school. The letter is signed by two others: Kevin Bell, a Youth Development Specialist, and Dennis Brownfield, possibly G.D.'s sixth-grade teacher. (Dkt. 20 at ECF 13.) The letter states, in relevant part,

> [G.D.'s] mother was very well organized, well dressed and very determined parenting skills. [G.D.'s] mother was not confusing. You can tell [G.D.] came from a good home environment because of the student [G.D.] was. She was always clean, on time. Her mom was always productive with trying to help her with her school work.

(Dkt. 20 at ECF 13.)

Plaintiff has submitted Ms. Boyd's letter to challenge the ALJ's conclusion that Plaintiff's parenting contributed to G.D.'s behavioral problems. At the start of his functional equivalence analysis, the ALJ reasoned:

> The record establishes that the claimant has developed a serious mental disorder that significantly limits her functioning. However[,] I note that the mother has serious psychological problems. The mother's erratic behavior has been documented in the record on numerous occasions. Her pressured speech, flight of ideas and confusing manner at the claimant's [December 2006] mental evaluation [with the State DDS] was reported by the state medical consultant. Dr. Goergen also noted that, while the claimant appeared neatly dress with appropriate hygiene, the mother, however, displayed poor hygiene. Social Security Administration's disability officials have also documented the claimant's mother's neglect in responding to disability related notices and phone calls, in addition to disconnecting the phone when attempts were made to reach her. Furthermore, at the hearing the claimant's mother displayed pressured speech, provided irrelevant responses to questions and was

15

> disrespectful. *I find that whatever behavioral issues the claimant may have, are due, in large part, to her mother's own poor conduct and I concur with Dr. Goergen's [December 2006] assessment that the claimant's mother needs better parenting skills for her children's well being.*

(Tr. 32-33 (citations to the administrative record omitted, emphasis added).) Further, in the domain of interacting and relating with others, the ALJ found "that the claimant's frustration at home is due to the mother's poor parenting skills and not the claimant's inability to relate to others." (Tr. 36.)

Assuming, without deciding, that the undated Boyd letter is "new" (it was presumably not in existence prior to the ALJ's December 2009 decision) and that Plaintiff can demonstrate "good cause" for not obtaining the letter earlier (perhaps because she did not know that the ALJ would rely on her parenting ability as one of the bases for her decision), the Court nonetheless finds that a sentence six remand to consider the letter is not warranted. The Boyd letter is not material in the sense that there is no reasonable probability that the ALJ would reach a different outcome regarding Plaintiff's parenting if the letter were to be considered. As quoted above, the ALJ relied on three pieces of evidence to reach his conclusion about Plaintiff's parenting of G.D. First, Marshall, a psychologist, and Dr. Goergen, a psychiatrist, noted that (1) G.D. became "irritated and frustrated" with her mother's questions during the evaluation, (2) G.D.'s frequent irritability "appears to be related to the mother's confusing and disorganized parenting style," and (3) G.D.'s prognosis was fair if her "mother had a psychological evaluation and received parent training and psychological care." (Tr. 199-202.) Second, the ALJ relied on a note from a log kept by an SSA representative. The log indicates that, at one point, the representative had "no idea where to send a cab [for G.D.'s evaluation] or even if [Tamra] is planning on going to this [evaluation]. Tamra has been extremely

16

difficult to reach and has failed to follow through in the past."[5]  (Tr. 187-88.)  Third, the ALJ relied

on her own observations of Plaintiff at the hearing, including Plaintiff's responses to her

questioning.  In fact, when the ALJ asked G.D.'s mother why she did not give prescribed medication

to G.D. during summer school (but instead chose to wait until the fall) she responded,

> I didn't think about that.  I probably should have put her on it and
> helped her.   I'm kind of – they say I'm manic
> depression/bipolar/schizophrenic. I'm like try to keep myself straight
> you know, and do the best with my kids.  And I just didn't truthfully
> think about it.  Beings it was school she – yeah, she should have been
> on it to help her.

(Tr. 15.)  Against this considerable record evidence Plaintiff has provided a lay-witness letter

indicating that Plaintiff is "well organized," has "very determined parenting skills," and is "not

confusing."  The letter does not lay much foundation for this assessment however.  In particular, it

omits when Ms. Boyd (or the other signatories) observed Plaintiff parenting G.D., how often, for

how long, and in what types of situations.  The Court believes that in light of the other substantial

evidence in the record, including comments by a psychologist and psychiatrist and the ALJ's own

in-person assessment,  the Boyd letter is unlikely to alter the ALJ's ruling.  Moreover, irrespective

of the Plaintiff's parenting skills, the ALJ found that G.D. did not have an impairment or

combination of impairments that met, medically equaled, or functionally equaled a Listing.

Accordingly, the Boyd letter is not material for purposes of a sentence-six remand.

---

[5]Contrary to the ALJ's statement, however, the log does not indicate that G.D.'s mother hung
up on the SSA representative.  Rather, the SSA representative was disconnected when attempting
to contact one of G.D.'s schools.

2.   *Student Behavior Reports and Expulsion Letter*

Plaintiff asks this Court to consider additional evidence regarding G.D.'s in-school behavior that was not part of the administrative record before the ALJ.  Student behavior reports indicate that between October 2003 and June 2007 G.D. had three referrals and two suspensions (Dkt. 14 at ECF 1), and that between September 2008 and October 2009 G.D. had 11 suspensions (Dkt. 14 at ECF 5-8).  The latter suspensions were for, among other things, fighting on the bus, throwing a nickel at a teacher, shouting profanities at other students, walking out of class without permission, and being rude or insubordinate to a teacher.  (Dkt. 14 at ECF 5-8.)  In addition, a November 2, 2009 letter indicates that a hearing panel of the Flint Board of Education "elected" to expel G.D. for 180 days and that a vote on that election would be forthcoming.  (Dkt. 14 at ECF 4.)  It appears that the Flint Board of Education did in fact expel G.D.: from 2010 to 2011 G.D. was instructed by a "Math Expulsion Teacher."  (Dkt. 14 at ECF 11-12.)

The Commissioner concedes that this non-record evidence of G.D.'s in-school behavior was not available to the ALJ or Plaintiff and that Plaintiff has "good cause" for not producing it earlier.  (*See* Dkt. 19, Def.'s Mot. Summ. J. at 7.)  However, the Commissioner argues that this evidence is "mostly" cumulative (and therefore not new) and that the evidence is not material "because it does not demonstrate that G.D.'s school behavior problems were caused by a mental disorder."  (Def.'s Mot. Summ. J. at 9-10.)

The Court agrees with the Commissioner that the student behavior reports and expulsion letter are largely cumulative of evidence already of record.  The hearing before the ALJ took place after G.D.'s 2008-09 school year (seventh grade).  Plaintiff testified that G.D. would not stay in the classroom, that she did not pass the seventh grade, and that she had received suspensions for "talking

18

too much, being in the halls, arguing or fighting or – [just about] everything there was to be kicked out for."  (Tr. 11.)  When the ALJ asked how many times G.D. had been suspended, Plaintiff said "[e]very time she would get back in" and "it was a whole screen . . . . I don't know how many times. It was ridiculous.  It made her get all E's at the end of the year."  (Tr. 11.)  In addition, the ALJ considered the April 13, 2009 medical record from Dr. Chheda and noted that G.D.'s mother reported to Dr. Chheda that G.D. was disruptive and had "severe episodes of rage."  (Tr. 32.)  That medical record also provides that G.D. threw things, "[o]ften argues with teachers, parents and other adults," and "actively or passively defies authority such as teachers, parent[s], etc." (Tr. 218.)  The ALJ did not state that Plaintiff's testimony about G.D.'s school behavior or her reports to Dr. Chheda were not credible.  Thus, although the precise number of suspensions and the reasons for them were not available to the ALJ, the ALJ was well aware of G.D.'s suspensions and the nature of the behavioral issues that resulted in those suspensions.

To the extent that the November 2009 expulsion letter and the student behavior reports are not entirely cumulative of evidence before the ALJ, it is unlikely that they would alter the ALJ's disability determination.  First, as discussed above, the ALJ mostly attributed G.D.'s behavioral issues to Plaintiff's parenting rather than any mental impairment.  Second, it is unclear what aspect of the ALJ's decision would be affected by the new disciplinary information.  It is highly unlikely that it would affect the ALJ's meets or medically equals conclusion; there, the ALJ reasoned that "the *medical evidence* falls short of the criteria of the [Listing], and no *medical source* has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr. 30 (evidence added).)  As to functional equivalence, the new disciplinary records appear relevant to only the domains of attending and completing tasks and interacting and relating

19

to others.  The ALJ found "no limitations" in these domains (Tr. 33-35), and to obtain a different result on remand, the ALJ would have to dramatically depart from these earlier conclusions and find "marked" limitations in these domains or an extreme limitation in one of them.  *See* 20 C.F.R. § 416.926a(d).  Accordingly, the Court additionally concludes that to the extent that the new behavioral documents are not cumulative, they are not material for purposes of a sentence six remand.

### 3. *The Lewis Letter*

Plaintiff argues in her summary judgment motion that G.D.'s school gave certain social-security paperwork, apparently the Teacher Questionnaire Ms. Williams ultimately completed, to the "wrong teacher."  According to Plaintiff, Ms. Lewis was the fifth-grade teacher who was much more familiar with G.D. and should have completed the questionnaire.  (Dkt. 14 at ECF 1-2; Dkt. 15 at ECF 1-2.)  Apparently, Lewis indicated on one of G.D.'s report cards that G.D. needed to use her time more constructively, put forth greater effort overall, and that G.D.'s mood swings interfere with her work.  (Dkt. 14 at ECF 2.)  Well after the ALJ's decision, in January 2011, Plaintiff wrote a letter stating that "Ms. Lewis had noted [G.D.'s] mood swing[s] interfered with her work, that she needs to use her time more productively, and put forth greater effort overall."  (Dkt. 15 at ECF 4.)  Ms. Lewis signed the letter Plaintiff wrote.  (*Id.*)

Plaintiff apparently asks this Court to consider the Lewis letter in view of the ALJ's reliance on the Teacher Questionnaire completed by Ms. Williams.  In her functional equivalence analysis, the ALJ relied on Williams' evaluation as follows:

> With regard to the claimant's adjustment disorder, the claimant's teacher, Darlene Williams, completed a comprehensive evaluation in November 2006.  Ms. Williams stated that the claimant has "a slight problem" in expressing her ideas in writing, but has "no problem" in

20

> any other area including understanding instructions, reading, learning new material, memory and applying problem solving skills. She stated that the claimant works well individually and with others. In addition[,] Ms. Williams found that the claimant shows good concentration; can carry out simple or multi-step tasks; is well organized; completes her homework accurately without making mistakes; can work without distracting others and finishes her work on time. By any standard, this is an excellent report.

(Tr. 31.) The ALJ also relied on Williams' questionnaire in concluding that G.D. had "no" limitations in the following three functional domains: acquiring and using information, attending and completing tasks, and interacting and relating to others. (Tr. 33-36.)

The Lewis letter does not warrant a sentence six remand. As an initial matter, Plaintiff has not demonstrated good cause for not producing comparable evidence earlier. She asserts that the SSA sent the wrong teacher the Teacher Questionnaire and it was not until a new principal arrived at G.D.'s school that she was permitted to obtain a letter from Lewis. This may be so, but the letter Plaintiff now produces merely recites Lewis' report-card comments. (Dkt. 14 at 2.) And it appears that Plaintiff found the Lewis-completed report card "in a photo album from [G.D.'s] school [that Plaintiff] did not know [she] had." (Dkt. 15 at ECF 1.) This is not an adequate explanation for Plaintiff's failure to produce the report card to the ALJ.[6] *See Haney v. Astrue*, No. 5:07CV188, 2009 WL 700057, at *6 (W.D. Ky. Mar. 13, 2009) (internal citations omitted) ("Good cause is demonstrated by a showing that something extrinsic to the claimant's prosecution of his claim and beyond his control prevented timely production of evidence.").

Moreover, assuming that Plaintiff has good cause for not producing the Lewis letter earlier,

---

[6]Plaintiff states that "I sent [G.D.'s] report card to [all of you] along with a letter from Mrs. Lewis the new principal let her sign." (Dkt. 15 at ECF 2.) Given the reference to the Lewis letter, the Court believes that Plaintiff attempted to send the report card to either this Court or the SSA after the ALJ's decision.

the letter is largely cumulative of evidence in the record.  Most significantly, it states that G.D.'s mood swings interfered with G.D.'s work.  But, as mentioned, the ALJ was aware of G.D.'s behavioral issues at school and her poor grades.  Further, G.D.'s mood swings are mentioned at several places in the administrative record.  At the hearing before the ALJ, Ms. Moore testified that G.D.'s "mood swings bad. [She] cr[ies] if she can't get her way."  (Tr. 20.)  G.D.'s mother reported to the State DDS evaluators (Marshall and Dr. Goergen) that "mood swings" interfere with G.D.'s work.  (Tr. 199.)  And  G.D.'s chief complaint to Dr. Chheda was "frequent tantrums and mood swings slowly increasing in frequency over time."  (Tr. 218.)  Finally, even though Lewis may have been the more appropriate teacher to complete G.D.'s Teacher Questionnaire because she knew G.D. better than Williams, Williams still indicated on her questionnaire that she had known G.D. for a month.  Thus, the ALJ could reasonably credit William's evaluation even with the Lewis letter in hand.

Accordingly, the Lewis letter does not warrant remand.

**G.  Conclusion**

This Court finds that a remand for consideration of evidence Plaintiff has produced to this Court after the ALJ issued her opinion and that is not part of the administrative record is not warranted.  For the foregoing reasons, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.  To the extent that G.D.'s condition is deteriorating, Plaintiff may file another disability application.  *See Franklin v. Comm'r of Soc. Sec.*, 55 F. App'x 740, 741 (6th Cir. 2003) ("If [Plaintiff] believes that his condition has deteriorated since his initial application, the proper

22

procedure is for [Plaintiff] to file a new application for benefits.").

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: October 6, 2011

23

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 6, 2011.

s/Jane Johnson_____
Deputy Clerk

24